402

SCHWEYER ELECTRIC & MFG. CO. v.
READING CO. et al.
No. 4679.

Circuit Court of Appeals, Third Circuit.
Jan. 4, 1933.

C. B. Des Jardins and Melville Church, both of Washington, D. C., for appellant.

Richard Eyre and John P. Bartlett, both of New York City, for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge.

The patents in this case concern the automatic cautionary signaling of running railroad trains and the automatic mechanical control of such trains' motive power. We say mechanical control as contrasted with engineer control. From the testimony it is clear that no automatic signaling device of any character, whether followed by either mechanical or engineer control, has yet been devised which is wholly satisfactory in railroad operation. It will, of course, be noted that every proposed automatic signaling device must be of exact precision, dependable working, delicate adjustment, and yet so strong and protected as to withstand weather conditions and the rough usage and abuse incident to unguarded railroad apparatus. Moreover, every proposed automatic system concerns, and must adjust itself to, two basic factors, both of which must be preserved substantially as now installed in railroad practice, namely, visible block signaling and air brake application in a proper manner. We say "air brake application in a proper manner," for, while brake application may effect stoppage, yet such stoppage may be of a kind that will effect even more damage than nonapplication of the brakes. To illustrate, we quote from the proofs. Referring to the instant use of an emergency or absolute instantaneous stop, the proof is: "The shock of the emergency is greater at a lower rate of speed than at a higher rate, due to the friction of the mechanism of the train and the friction of the brakes on the wheels. Therefore, if the emergency is applied, even though the engineman is alert, it is bad."

Referring to the danger of an instant mechanical control application of the brakes as contrasted with an engineer's gradual application of the brakes, which in railroad practice is called "stretching" the train, the proof is:

"On freight trains, which are long today, and which in 1917 and 1918 were in the neighborhood of 100 cars, the emergency being applied, of course, the air brakes go on in the first cars first and gradually work back to the caboose. There is slack between each car—there must be—they cannot be rigidly connected. So that, applying the emergency on the front end of the train and working back to the rear of the train gradually, the slack works up and we have theoretically a collision between the front end of the train and the rear of the train, due to the fact that the front of the train stops first, and if there is a weak car in that freight train, it is very likely to buckle, and if it buckles it is very likely to be thrown over on the other track, thus blocking the other track in such a manner that the track circuit would not be shunted, and making it possible for a train passing in the opposite direction to run into the collision. * * *

"With reference to the mechanism also automatically controlling the engine throttle

for supplying the power to the locomotive, closing down the throttle in going through a caution block and shutting it off at a danger point, I believe I mentioned something along that line in previous testimony, in that, if you apply the brakes on a long freight train, or any train for that matter, due to the slack between the cars, the front end of the train stops before the rear end stops. Therefore, it is customary for the engine man, in making a brake application, to keep his throttle open, to keep the front end of the train pulled along until the brakes can get applied on the rear end, and, as a railroad man expresses it, keep the train stretched, to prevent that moving up of the rear end, coming in collision with the front end of the train, and causing a considerable shock. Therefore, in my estimation, the cutting off of the power is detrimental to safe train operation."

In surveying the general phases of this broad field, we note that the railroads have been keenly desirous to have developed a satisfactory automatic signaling and mechanical train-control device. This is evidenced by a prize of $10,000 offered some years ago by the New York, New Haven & Hartford Railroad for a satisfactory automatic device. The Interstate Commerce Commission was also actively interested in the problem and contributed its service in the way of advice to persons seeking to devise railway signaling devices. Indeed, showing the widespread interest in the problem, we note that some eighteen hundred plans were submitted. None of them proved satisfactory and the offer of the prize was withdrawn.

It will also be observed that in the automatic signaling art there are two distinct and different systems.

One is called the "intermittent," in which when the track conditions actuate mechanism which signals and controls power application, no further or intermediate track conditions signal or change the status until a new signaling track point is reached which operates to change the prior status. In this "intermittent" system, when the track condition actuates the mechanism and assumes control of power application, the engineer ceases to change or control power application. The system gets its name "intermittent" from the fact that signaling from the track is only permissible at certain points and in the interim between those points no signals or changes of power control are made.

In the other, termed the "continuous" system, the signaling devices remain in continuous touch with track conditions and

are adapted to signal to the engineer changed track conditions. The signals effect no power application and the engineer at all times is in control of power application to be applied to stopping, increasing, or decreasing speed and to applying or releasing brakes. It will therefore appear in the "continuous" system there is continuous potential connection between track conditions and the signals in the cab which are displayed to the engineer and the speed control by the signal-instructed engineer is continuous because track conditions are continuously—not intermittently—reported. On the other hand, the "continuous" element is a continuous, automatic, mechanical, nonengineer control which does away with "continuous" track signaling capacity and also with "continuous" engineer control of power application. However, when cautionary or speed reduction signal conditions exist, train dispatch makes it highly desirable that the train, of course under control, keep moving, if safety permits, rather than to be brought to a stop; or, if running at low speed under cautionary signals and track conditions change and permit the engineer to speed up, of course under control, his train, moving needlessly slow, may be speeded up.

The general principles incident to the "continuous" system were well understood before the plaintiff's patent. In a public address made in 1913, a signal engineer of repute said:

"The principal signal indications are defined as follows:

"1—Proceed.

"2—Proceed with caution.

"3—Proceed at medium speed.

"4—Proceed at low speed.

"5—Stop.

"The speed under the *first indication is usually limited* by rule to some *predetermined maximum value;* the second indication means proceed, prepared to stop at the next signal; the third is used at a cross-over, or at the entrance to a diverging route; the fourth is used at the entrance to a siding or to an occupied block. The fifth indication, when used at an interlocking plant, means that the signal is not to be passed until permission has been received; at an automatic signal it means that the signal may be passed with caution after a full stop has been made, with the expectation of finding the block occupied, an open switch, broken rail, etc. It is to be noted that, of these five indications, four contain instructions which provide for continued movement of the train, and the

fifth provides for proceeding either at once or as soon as permission is received.

"The function of the *automatic stop is obviously* to stop trains. The general public impression is that this is also the purpose of a block signalling system, but, as a matter of fact, this is not the case; the purpose of block signals is to enable trains to run; or, more specifically, to enable trains to run safely at speeds higher than would be possible without their use."

It will also be noted, as seen above, that it is highly desirable, on account of the great danger caused by emergency and nonstretched stops to trains running on adjoining tracks, to utilize the engineer's skill and experience, instead of resorting to the rigid, inflexible train stoppage or speed control of a mechanical device.

Now the proof is that the "intermittent" system is highly objectionable. Thus the witness Morrison, an experienced railroad man, testified that the patent in suit is the "intermittent" type and of it he says: *"If a train enters a caution block in excess of the speed set by the device,* the brakes are taken out of the hands of the locomotive engineer; they are applied; they are *released* automatically and again applied, so that the engine man would, in my estimation, *be afraid of a device* of that kind, and his morale would be *greatly reduced.* In my opinion, the continuing control by speed during the caution block *introduces a hazard.* * * * In my opinion, a continuous speed control in an intermittent automatic train control device is more hazardous and interferes with the operation of the train more than a device that would, if the train entered a caution block at a speed exceeding the speed control device setting, get a brake application, and after bringing the train down to a low rate of speed, would permit the engine man, if alert, to control the speed of his train as he would do in his judgment. The continual applying of the brakes and releasing them automatically out of the control of the engine man has a tendency to deplete the air in the main reservoir, especially if there is considerable leakage of air, on a freight train, so that when the point where the emergency brake should be applied is reached, the air is likely to be depleted to a point where the emergency application would not be as effective as it would be had the system been in the control of the engine man. With reference to the mechanism also automatically controlling the engine throttle for supplying the power to the locomotive, closing down the throttle in going through a cau-

tion block and shutting it off at a danger point, I believe I mentioned something along that line in previous testimony, in that, if you apply the brakes on a long freight train, or any train for that matter, due to the slack between the cars, the front end of the train stops before the rear end stops. Therefore, it is customary for the engine man, in making a brake application, to keep his throttle open, *to keep the front end of the train pulled along* until the brakes can get applied on the rear end, and, as a railroad man expresses it, keep the train *stretched,* to prevent that moving up of the rear end, coming in collision with the front·end of the train, and causing a considerable shock. Therefore, in my estimation, the cutting off of the power is detrimental to safe train operation."

Now the stoppages in the Schweyer "intermittent" device are effected by providing the rail and the engine with a co-operation ramp device. When conditions of danger in running or running at a greater speed exist, the train and track ramps co-operate and put into action the brakes. When so functioning, the engineer, as we have said, loses control until the train reaches a point where there is again ramp action showing a different track condition. During that intermediate period the engineer is unable to speed up his train and be allowed to move forward at a rate that would enable him to stop before passing·into another block. In this way the train may run a considerable distance at a very low rate of speed, when in point of fact during such period the danger condition in the blocks ahead may have been removed by the passage of. the preceding train, or indeed that it would be perfectly safe, even though the caution signal continued, for the engineer to speed up to a considerable extent and thus lose less schedule time.

In the "continuous" system there is a continual communication between the tracks and the signals in the locomotive cab, so that the warned engineer can intelligently and safely control his train movements from the information he has as to the then condition of the tracks. Where he has a danger signal coming from ahead, he can still run up to a speed which enables him to stop before he enters the danger block. In the "intermittent" system there can be no such continuing engineer speed control during the interim noted.

Turning again to the "continuous" system, it will be seen that where there is a continuous communication with the track, the situation is at each instant controllable by

the then existing track conditions, so that at each of these interim moments the train can proceed at a speed suitable to track conditions then existing.

Now as we regard it, Schweyer's device is of the "intermittent" or periodic type. It signals once and that condition continues until another signal changes the situation and so on and on. The object of Schweyer, as stated in his principal patent, was twofold, namely, "the propelling power of the train cut down in the event of such train running by a caution signal above a predetermined speed." And further: "It is also my purpose to provide apparatus of the class described whereby an emergency application of the brakes will be brought about and the propelling power of the motor car cut off in the event of the train passing a danger signal." In other words, he controls by his automatic system the propelling power of the train, a thing which the "continuous" system does not do, for the engineer never loses control of the propelling power. We think the ramps stamped Schweyer's device as a periodic or "intermittent" one.

 Every element of Schweyer's device was in itself well known in the railroad art. He used a stick battery to keep his mechanism in normal or "unbraked" condition. As we have said, between signals the engineer loses control of the train. Before his alleged invention was made, the prize award above noted had challenged the keen attention of all interested in the subject. With this financial inducement in view, the art did not seem to have recognized Schweyer's device as serviceable and indeed, when tried on the Reading system, it did not show it was successful enough to warrant the risk of installation and use. We think, in view of the earnest purpose of the railroads and the Interstate Commerce Commission to obtain a satisfactory automatic system, that we are justified in regarding, as the court below did, the device of Schweyer as a theoretical or paper patent. Indeed, from all we can see, Schweyer's device was an instance of engineering and did not involve invention. Evidently the Interstate Commerce Commission, which had been specially studying these questions, regarded the making of a satisfactory automatic signaling device as a matter of engineering, rather than inventive work. They ordered railroads to install some automatic signaling mechanism, but they could not order them to make inventions. Evidently the thought of the Interstate Commerce Commission was that it was an engineering question rather than one of patenting.

The defendant's device, to our mind, is a "continuous" system. It differs from the Schweyer in its continuous reporting of track conditions and keeping the engineer in control of the train. It has no ramps. It has no stick battery. It has been in working operation and does not appear to destroy or affect the morale of the engineers. Its automatic features come into action and challenge the attention of the engineer when he is not doing his part. It spurs him on to do his duty. The H. M. & L. signals of the defendant's device are not possible in Schweyer's because the continuing indications or control by Schweyer evidence past track conditions and not those which are actually existing. The proof is that defendant's "continuous" system became available from "the amplifier and receiver of the pick-up mechanism, whereby we got absolute control as the train proceeded through the block." Indeed, the defendant's device never makes an automatic emergency application of the brakes and never applies the brakes in the event of the train passing any signal. The plaintiff's is a mechanical brake application device; the defendant's is a control appliance which determines when brake application may or should be made. Schweyer's device is an automatic, mechanical brake application, while the defendant's is a human control appliance which, while it automatically signals track conditions, nevertheless allows the engineman to determine when brake application shall be made. In Schweyer's the automatic device applies the emergency brake; in the defendant's the engineer selectively and timely applies it. Schweyer's device has mechanism that makes two different kinds of brake applications; one during service or operative conditions, and the other under emergency conditions. He thus has three positions, two different brake applying positions and an inactive position. The defendant has but two, one a brake applying and the other an inactive.

 The court below found as a fact that Schweyer's and the defendant's were different systems. We agree with that finding. They are directed to different objects and they produce different results, one intermittent or periodic signaling, and the other continuous signaling. That the defendant uses many of the appliances common to the art, and that Schweyer also uses many of the same appliances, does not constitute infringement, because the two combinations are whol-

ly different and the purpose of each of the combinations is distinctly different from that of the other. The two devices had different goals in view; they reach those goals by different paths. There is no infringement, for each sought to avoid what the other desired and to effect what the other did not effect. The court below had the opportunity, which this court did not have, of seeing the Reading demonstration work of Schweyer as stated in the record, but even with this additional light it still held the patent was not infringed. We agree with that conclusion and are constrained to hold likewise. Indeed, we are satisfied that if any test of Schweyer's device had shown it was dependably workable, it would have been approved by the railroad and the commission and its adoption brought about by the railroads generally, which even now have not been able to find a wholly satisfactory device. With the invalidity of Schweyer's older patent shown, the second patent, which simply sought to improve the first device in a minor detail, necessitates no discussion.

The decree below is affirmed.